Ahren A. Tiller Esq. [SBN: 250608]
Email: ahren.tiller@blc-sd.com
BLC Law Center, APC
1230 Columbia St., Ste 1100
San Diego, CA 92101
Phone: (619) 894-8831
Facsimile: (866) 444-7026

Abbas Kazerounian, Esq. [SBN: 249203]
Email: ak@kazlg.com
Kazerouni Law Group, APC
245 Fischer Avenue, Suite D1,
Costa Mesa, CA 92626
Phone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional Counsel on Signature Page]

Attorneys for Plaintiffs,
NATHANIAL FOX, SARAH M. FOX, and
OSAMA TURGMAN

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

NATHANIAL FOX; SARAH M. FOX; and OSAMA TURGMAN, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

SPLITERO FUNDING, INC., a Delaware corporation; SPLITERO, INC., a Delaware corporation; SPLITERO MASTER TRUST; SPLITERO TRUST 2025-1; SPLITERO TRUST 2026-1; and DOES 1 through 10, inclusive,

Defendants.

Case No.: '26CV6477 DMS AHG

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF TILA, HOEPA, RESPA, AND CALIFORNIA CONSUMER PROTECTION LAWS; RESCISSION; AND DECLARATORY RELIEF**

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

1. Plaintiffs NATHANIAL FOX, SARAH M. FOX, and OSAMA TURGMAN (collectively referred to as "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their counsel of record, bring this action against Defendants SPLITERO FUNDING, INC., SPLITERO, INC., SPLITERO MASTER TRUST, SPLITERO TRUST 2025-1, SPLITERO TRUST 2026-1, and DOES 1 through 10, inclusive (collectively, "Splitero" or "Defendants"), and allege as follows on personal knowledge as to themselves and their own acts, and on information and belief as to all other matters. Nathanial Fox and Sarah M. Fox are referred to together as the "Fox Plaintiffs."

## INTRODUCTION

2. Splitero markets a product it calls a "Home Equity Investment" or "HEI." It tells homeowners the product is "not a loan," that no interest accrues, and that it creates no new debt. Homeowners receive a lump sum of cash. In exchange, they sign a recorded Deed of Trust with a power of sale, an assignment of rents, a fixture filing, an irrevocable power of attorney, and a liquidated damages clause, and they promise to pay Splitero a fixed percentage of the gross value of their home, not merely its appreciation, at the earliest of a sale, a refinance, a default, or a hard maturity date that may fall a quarter century in the future. If the homeowner falls behind on the first mortgage, the property taxes, or the insurance, Splitero may accelerate, foreclose, and sell the home.

3. That is a mortgage loan. It is an advance of money, secured by the borrower's principal dwelling, that the borrower must repay in the future together with a charge for the use of the money. California law recognizes precisely this structure as home-secured credit. California's reverse mortgage statute expressly contemplates that a reverse mortgage loan "may also provide for interest that is contingent on the value of the property upon execution of the

loan or at maturity, or on changes in value between closing and maturity." Cal. Civ. Code § 1923.2(b). The Ninth Circuit, examining a materially identical "option" product sold by Unison, determined that an arrangement "which includes a formal option as one component but effectively creates the substance of a shared-appreciation reverse mortgage" gives rise to a "credit obligation" under a state reverse mortgage statute containing the same contingent interest language, and determined that the homeowners adequately alleged that marketing such a product as involving no loan, no debt, and no interest "ha[s] the capacity to deceive." *Olson v. Unison Agreement Corp.*, No. 23-2835 (9th Cir. Aug. 7, 2025) (memorandum disposition), appeal dismissed on stipulated motion (9th Cir. Oct. 17, 2025).

4. Splitero's own documents concede the point. Splitero prepares, for each transaction, a "Repurchase Home Value Ledger" that discloses, in a table Splitero itself computes, an "Equivalent Annual Percentage Rate" for the transaction, "inclusive of origination fee and third-party costs." In the Turgman transaction described below, Splitero's own table discloses an Equivalent Annual Percentage Rate of 25.72 percent at the end of year one, 22.10 percent at the end of year two, and at least 18.65 percent at the end of year three, in every home value scenario Splitero modeled. A company that internally computes an annual percentage rate for its product, while telling the homeowner that the product carries no interest and is not a loan, knows exactly what it is selling.

5. By labeling its loans "options," Splitero has attempted to shed every consumer protection Congress and the California Legislature attached to home-secured credit: the Truth in Lending Act's disclosure of an annual percentage rate and finance charge; the three-business-day and three-year rights of rescission; the ability-to-repay requirement; the protections for high-cost mortgages under the Home Ownership and Equity Protection Act ("HOEPA"), including mandatory

housing counseling and the prohibitions on balloon payments and financed points; the statutory ban on mandatory arbitration and class waivers in residential mortgage loans; California's reverse mortgage and shared appreciation loan statutes; and California's lending and brokerage licensing and disclosure statutes. Splitero underwrites to the collateral alone, accepting credit scores as low as 500 and verifying no income, because it intends to be paid from the house.

6. The Fox Plaintiffs entered into a Splitero HEI on or about October 7, 2024, secured by their principal residence in Escondido, California. Splitero advanced $120,000, deducted a $5,988.00 origination charge and $1,840.23 in other closing costs from the advance, and took a Deed of Trust and a recorded "Notice of Option Purchase Agreement" giving Splitero the right to 29.56 percent of the gross value of the home, a home Splitero itself appraised at $812,000, subject to a "Safety Cap" of 19.99 percent per year compounding monthly. The advance was 14.8 percent of the appraised value. The Split Percentage was twice that figure, on day one.

7. Plaintiff Osama Turgman entered into a Splitero HEI on or about August 10, 2026, secured by his principal residence in Chula Vista, California. Splitero advanced $152,164, deducted $9,446.20 in origination and closing charges from the advance, and took a Deed of Trust and a recorded Notice of Option Purchase Agreement giving Splitero the right to 38.24 percent of the gross value of the home, a home Splitero appraised at $795,734, subject to a Safety Cap of 17.99 percent per year compounding monthly. The advance was 19.1 percent of the appraised value. The Split Percentage was again twice that figure, on day one. The identical two-to-one ratio in both transactions, originated 22 months apart on Splitero's standardized forms, reflects Splitero's uniform pricing formula.

8. In both transactions Splitero gave the homeowners no Truth in Lending disclosures, no annual percentage rate, no finance charge, no HOEPA disclosures, no housing counseling, no reverse mortgage counseling or waiting period, no mortgage loan disclosure statement, and no ability-to-repay determination. Splitero nonetheless treats the transaction as a loan whenever that serves Splitero: its escrow instructions describe the deal as a conventional uninsured loan; First American's settlement statement identifies Splitero as "Lender," the advance as the "Loan Amount," and the origination charge as "Points"; Splitero obtains an ALTA lender's title policy; it holds a California Department of Real Estate license and an NMLS identifier; it gave the Fox Plaintiffs a "Notice of Right to Cancel" that copies the federal rescission notice nearly verbatim; its form contract defines "Business Day" using the special definition that exists only in the federal rescission regulation; and it finances its originations through rated mortgage-style securitizations.

9. Plaintiffs bring this action on behalf of themselves and all similarly situated homeowners to obtain rescission, statutory and actual damages, restitution, cancellation of the recorded instruments, declaratory relief establishing that Splitero's Option Documents are residential mortgage loans subject to federal and California credit law and that their arbitration, jury waiver, and class waiver provisions are void under 15 U.S.C. § 1639c(e), and a public injunction under California's Unfair Competition Law and False Advertising Law prohibiting Splitero from marketing its loans to California homeowners as "not a loan" with no interest.

## JURISDICTION AND VENUE

10. This Court has original subject matter jurisdiction over Plaintiffs' claims under the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1640(e), and over Plaintiffs' claims under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"),

pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 2614. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same transactions, documents, and course of conduct as the federal claims and form part of the same case or controversy.

11. This Court also has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a State different from at least one Defendant. Plaintiffs are citizens of California. Defendants Splitero Funding, Inc. and Splitero, Inc. are Delaware corporations. Defendant Splitero Master Trust is, on information and belief, a trust whose trustee or custodian, Wilmington Trust, National Association, maintains its principal place of business in Delaware or New York. Defendants Splitero Trust 2025-1 and Splitero Trust 2026-1 are, on information and belief, Delaware statutory trusts whose trustees or custodians likewise maintain their principal places of business in Delaware or New York.

12. This Court has personal jurisdiction over Defendants because they maintain their principal place of business in San Diego, California, most recently at 4365 Executive Drive, Suite 925, San Diego, California 92121, and previously at 8910 University Center Lane, Suite 400, San Diego, California 92122; because Splitero represents that it is licensed by the California Department of Real Estate; and because Defendants originated, recorded, and enforce the loans at issue in this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District, a substantial part of the events giving rise to the claims

occurred in this District, and the real properties that are the subject of this action are situated in San Diego County, California.

## PARTIES

### A. Plaintiffs

14. Plaintiff Nathanial Fox is a natural person residing at 840 Lochwood Place, Escondido, California 92026 (the "Fox Property"). Nathanial Fox and Sarah M. Fox hold title to the Fox Property as husband and wife, joint tenants. The Fox Property is and at all relevant times was their owner-occupied principal dwelling. Nathanial Fox signed the Option Documents described below, received the Notice of Right to Cancel, and holds an ownership interest that is subject to the Deed of Trust recorded against the Fox Property. He is a "consumer" and an "obligor" within the meaning of TILA, 15 U.S.C. §§ 1602(i) and 1635, and Regulation Z, 12 C.F.R. §§ 1026.2(a)(11) and 1026.23(a)(1).

15. Plaintiff Sarah M. Fox is a natural person residing at the Fox Property. She is a joint tenant owner of the Fox Property, signed the Option Documents, received the Notice of Right to Cancel, and holds an independent right of rescission under 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23(a)(1). She is a "consumer" and an "obligor" within the meaning of TILA and Regulation Z.

16. Plaintiff Osama Turgman is a natural person residing at 357 Callesita Mariola, Chula Vista, California 91914 (the "Turgman Property"). Record title to the Turgman Property is vested in Osama Turgman, described in the Option Documents as a married man holding the Turgman Property as his sole and separate property. The Turgman Property is a condominium unit and is and at all relevant times was his owner-occupied principal dwelling. Osama Turgman signed the Option Documents and holds an ownership interest that is subject to the Deed of Trust recorded against the Turgman Property. He is a "consumer" and an "obligor" within the meaning of TILA and Regulation Z.

**B. Defendants**

17. Defendant Splitero Funding, Inc. is a Delaware corporation headquartered in San Diego, California. Splitero Funding, Inc. is the named counterparty to the Option Purchase Agreements, the originator of the advances, the payee of the origination charges, and the "Investor" identified on the Home Equity Investment Closing Disclosures. Splitero Funding, Inc. holds NMLS identifier 2327455 and represents that it is licensed by the California Department of Real Estate under License No. 02185149. Splitero Funding, Inc. regularly extends home-secured credit to consumers in the ordinary course of its business, and the obligations it originates are subject to a finance charge. It is therefore a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 1026.2(a)(17).

18. Defendant Splitero, Inc. is a Delaware corporation headquartered in San Diego, California. On information and belief, Splitero, Inc. is the parent of Splitero Funding, Inc., operates the website and marketing through which Splitero HEIs are solicited and originated, employs the personnel who originate them, and acts as or controls the "Servicer" identified in the Option Documents. On information and belief, Splitero has engaged a third-party servicer for at least some Class members' HEI agreements: the quarterly statement issued to the Fox Plaintiffs for July 2026 assigns the Fox HEI a "Servicing Account Number" and, under the heading "Ready to repurchase your HEI?", directs the homeowner to "RoundPoint Mortgage Servicing LLC."

19. Defendant Splitero Master Trust is the named Beneficiary of the Deeds of Trust recorded against the Fox Property and the Turgman Property, in each case "as assignee of Splitero Funding, Inc.," and the proposed insured under the lender's title policies. Splitero Master Trust took its interests by assignment from Splitero Funding, Inc. and is an "assignee" within the meaning of 15 U.S.C. § 1641. Documents recorded against the Fox Property and the Turgman

Property direct that they be returned to "Wilmington Trust, National Association, Attn: Non-Agency Splitero, 693 Seneca Street, Suite 415, Buffalo, NY 14210," which on information and belief is the trustee or custodian for Splitero Master Trust.

20. Defendants Splitero Trust 2025-1 and Splitero Trust 2026-1 (together, the "Securitization Trusts") are, on information and belief, Delaware statutory trusts organized by or for Splitero to acquire pools of HEI agreements and to issue rated notes secured by those pools. Splitero Trust 2025-1 closed a rated securitization of approximately $283.3 million in late 2025. Splitero Trust 2026-1 closed a rated securitization of approximately $296 million in May 2026. On information and belief, each Securitization Trust purchased, took assignment of, or holds interests in Class members' Option Documents, Deeds of Trust, and the receivables they generate, including, on information and belief, one or more of the transactions of the named Plaintiffs, and each is an "assignee" within the meaning of 15 U.S.C. § 1641. The Securitization Trusts are named as Defendants because the relief the Class seeks (rescission, cancellation of the recorded instruments, and reconveyance) runs with the loans and the liens and must bind every entity that holds or claims an interest in them. Wilmington Trust, National Association is, on information and belief, the trustee or custodian for the Securitization Trusts and for Splitero Master Trust, and is sued as a Doe solely in that capacity to the extent its joinder proves necessary for complete relief.

21. Plaintiffs are ignorant of the true names and capacities of the Defendants sued as DOES 1 through 10, inclusive, and therefore sue them by fictitious names. On information and belief, DOES 1 through 10 include the securitization trusts, special purpose vehicles, depositors, servicers, custodians, trustees, and affiliates to which Splitero has assigned, pledged, or sold HEI loans or interests in them, including without limitation entities bearing the "ACM" or "Alamosa"

designation, warehouse lenders and forward purchasers holding interests in Class members' Option Documents, Wilmington Trust, National Association, solely in its capacity as trustee or custodian, and any servicer or subservicer of the Option Documents, including RoundPoint Mortgage Servicing LLC to the extent it services Class members' HEI agreements. Each is an assignee of the original creditor, or an agent of an assignee, subject to liability under 15 U.S.C. § 1641 and to the state law claims pleaded below. Plaintiffs will amend this Complaint to allege the true names and capacities of the Doe Defendants when ascertained.

22. At all relevant times each Defendant was the agent, affiliate, alter ego, successor, or assignee of each other Defendant, and in doing the things alleged in this Complaint was acting within the course and scope of that relationship and with the knowledge, consent, and ratification of each other Defendant. On information and belief, the Splitero entities share common ownership, officers, offices, employees, and management; observe corporate formalities selectively; move loans, receivables, and fees among themselves and their trusts without arm's-length documentation; and structure their affairs so that the entity that faces the homeowner holds few assets while the economic value of the loans sits in trusts organized for the benefit of investors. Adherence to the fiction of the separate existence of the Splitero entities would promote injustice and permit an abuse of the corporate privilege.

## FACTUAL ALLEGATIONS

### A. Splitero's "Home Equity Investment" Product

23. Splitero markets its HEI to homeowners who need cash and who cannot, or would prefer not to, qualify for a conventional home equity loan or line of credit. Splitero advertises a minimum credit score of 500, no income or employment verification, no monthly payments, no interest, and no new debt,

and represents that the transaction is an option or an investment rather than a loan.

24. The HEI is documented by a standardized package of form documents that Splitero drafts and does not negotiate (collectively, the "Option Documents"): (a) a "Splitero Option Purchase Agreement" (the "OPA"); (b) a "Deed of Trust," which the OPA calls the "Security Instrument," with a "Schedule B" styled "Notice of Option Purchase Agreement" that is recorded with the Deed of Trust; (c) a "Home Equity Investment Closing Disclosure"; (d) in at least some transactions, including the Fox transaction, a "Notice of Right to Cancel"; and (e) where the homeowner is married and the spouse is not on title, a "Consent of Spouse or Civil Partner." The OPA attaches the Security Instrument as its Exhibit A, the Consent of Spouse or Civil Partner as its Exhibit B, the legal description as its Schedule 1, its repayment formulas as its Schedule 2, and the Closing Disclosure as its Schedule 3.

25. Under the Option Documents, Splitero pays the homeowner a lump sum (the "Investment"). The homeowner grants Splitero an "exclusive and irrevocable option" to purchase an undivided percentage interest in the home (the "Split Percentage") at any time through a fixed "Option Expiration Date." The homeowner may terminate Splitero's interest only by paying Splitero the "Total Repurchase Amount," which Schedule 2 of the OPA defines as the "Splitero Split" plus fees, where the Splitero Split is the lesser of (i) the Split Percentage multiplied by the "Repurchase Home Value" or (ii) the "Safety Amount," which is the Investment compounded monthly at the "Safety Cap" rate. The fees added to the Total Repurchase Amount include "Administrative and Third Party Fees" and "Protective Advances," including unpaid interest on Protective Advances.

26. The OPA defines the "Safety Cap" as "the maximum gross rate payable, compounding monthly that Splitero will be entitled to." Schedule 2 of the OPA

expresses the Safety Amount as a compound interest formula: the Investment multiplied by one plus the Safety Cap divided by twelve, raised to a power that counts the number of compounding periods from the Effective Date to the date of repayment. That is the formula for principal plus interest at a stated annual rate, compounded monthly. A Safety Cap of 19.99 percent compounded monthly is an effective annual rate of approximately 21.9 percent. A Safety Cap of 17.99 percent compounded monthly is an effective annual rate of approximately 19.6 percent.

27. The Split Percentage is applied to the gross value of the home, not to the homeowner's equity and not to any appreciation. The OPA's definition of "Gross Sale Price" provides that the calculation "shall exclude any deduction for any liens, costs or obligations to which Homeowner is responsible for, including, but not limited to, liens on the Property." Splitero's share therefore comes off the top. The homeowner's senior mortgage is paid entirely out of the homeowner's remaining share.

28. The Split Percentage substantially exceeds the ratio of the Investment to the home's appraised value. In the Fox transaction, Splitero advanced 14.8 percent of its own appraised value and took a Split Percentage of 29.56 percent. In the Turgman transaction, Splitero advanced 19.1 percent of its own appraised value and took a Split Percentage of 38.24 percent. In each case the Split Percentage is two times the percentage of value advanced. On information and belief, Splitero prices every HEI with the same standardized multiple, so that on the day the transaction closes the homeowner already owes Splitero, out of the existing value of the home, approximately twice what Splitero paid.

29. The Option Expiration Date is a hard maturity date. The Closing Disclosure describes it as "the greater of the maturity date of your first lien mortgage, or ten (10) years from the Effective Date." Splitero's Repurchase Home Value Ledger states that "[t]he final term may vary to match the maturity date stated

in the recorded senior lien," and, on information and belief, Splitero markets this feature to investors as a "Maturity Match" structure that synchronizes each HEI with the borrower's remaining first mortgage term. In the Fox transaction the Option Expiration Date is August 1, 2050. In the Turgman transaction it is December 1, 2050. At the Option Expiration Date, absent an earlier sale or buyout, the entire Total Repurchase Amount comes due at once.

30. Splitero's principal is not at meaningful risk. Because Splitero takes a fixed percentage of gross value, Splitero loses any part of its advance only if the home loses roughly half of its appraised value. In the Fox transaction, Splitero's $120,000 advance is impaired only if the Fox Property falls below approximately $406,000, a decline of roughly 50 percent from Splitero's own appraisal. In the Turgman transaction, Splitero's $152,164 advance is impaired only if the Turgman Property falls below approximately $398,000, a similar decline. The Option Documents further require the homeowner to insure the Property, to maintain it, to pay all taxes, and to keep all senior liens current, and they give Splitero the right to make "Protective Advances" bearing interest at 10 percent per year and to foreclose if the homeowner does not comply. Splitero has structured the transaction so that the only risk it bears is the risk inherent in every secured loan: that the collateral will prove insufficient.

**B. The Fox Transaction**

31. In or around September 2024, the Fox Plaintiffs applied to Splitero for an HEI. Splitero did not request or verify their income, employment, or ability to repay. On information and belief, Splitero obtained a credit report and an appraisal, appraised the Fox Property at $812,000, and offered a $120,000 Investment in exchange for a 29.56 percent Split Percentage, a 19.99 percent Safety Cap, and an Option Expiration Date of August 1, 2050, a term of approximately 25 years and 10 months.

32. On or about October 7, 2024, at a signing conducted by a notary public in San Diego County, the Fox Plaintiffs executed the Option Documents, including the OPA (27 pages), the Deed of Trust with the Schedule B Notice of Option Purchase Agreement (18 pages), the Home Equity Investment Closing Disclosure (5 pages), and six copies of a "Notice of Right to Cancel." Splitero's signing instructions directed that the Deed of Trust and the Notice of Option Purchase Agreement be notarized for recording, and that each homeowner receive two copies of the Notice of Right to Cancel to take away.

33. The Fox Deed of Trust, recorded with its Schedule B Notice of Option Purchase Agreement in the Official Records of San Diego County on October 11, 2024, as Document No. 2024-0275302, names the Fox Plaintiffs as "Homeowner," First American Title as Trustee, and "Splitero Master Trust, as assignee of Splitero Funding, Inc." as Beneficiary. Its granting clause provides that the Homeowner irrevocably "grants, transfers and assigns" the Property to the Beneficiary and Trustee "in trust, with power of sale." It bears the statutory subordination clause warning required of California deeds of trust. It secures payment of the Total Repurchase Amount, all other obligations under the Option Documents, all expenditures made by the Beneficiary, and all attorneys' fees.

34. The Fox Deed of Trust contains, in the same standardized articles that appear in the Turgman Deed of Trust described below: (a) a UCC security agreement and fixture filing; (b) an assignment of all leases and rents that the Homeowner "irrevocably, absolutely and unconditionally assigns" to the Beneficiary, enforceable without notice upon default; (c) an irrevocable power of attorney appointing the Beneficiary as the Homeowner's agent, coupled with an interest; (d) a covenant to pay interest at the rate specified in California Civil Code § 3289 on sums the Beneficiary advances; (e) a "Default and Foreclosure and Power of Sale" article authorizing the Beneficiary, after a notice of default with

a cure date not less than 30 days out, to "require immediate payment in full of all sums secured by this Security Instrument without further demand" and to "invoke the power of sale"; (f) a "Liquidated Damages" article incorporating the Total Repurchase Amount calculated under Schedule 2 of the OPA, under which, "[i]n the event of Liquidated Damages, the Repurchase Home Value shall be the highest Appraised Value"; and (g) a provision that the lien encumbers the "Homeowner's entire interest in the Property, notwithstanding the fact that the Option Purchase Agreement relates to only a fractional interest in the Property."

35. The Fox Home Equity Investment Closing Disclosure, a document Splitero designed to resemble, but not to comply with, the closing disclosure required for mortgage loans by Regulation Z, itemized the transaction as follows: Investment of $120,000.00; "Origination Charge" of $5,988.00, described as 4.99 percent of the Home Equity Investment Amount; appraisal, credit report, flood certification, title, escrow, notary, endorsement, and recording charges totaling $1,840.23; scheduled payoffs of $34,943.37 to Third Federal Savings and Loan, an existing home equity line of credit; and "Cash to Homeowner" of $77,228.40. Splitero disclosed no annual percentage rate, no finance charge, no amount financed, no total of payments, no payment schedule, and no statement of the maximum amount the Fox Plaintiffs could be required to pay. Under the heading "Taxes and Other Government Fees," the Fox Closing Disclosure charged $344.00, consisting of a $119.00 recording fee and a $225.00 SB2 fee for the security instrument. The recorder's stamp on the Fox Deed of Trust reflects that the San Diego County Recorder collected total fees of $149.00, including an SB2 Atkins fee of $75.00, which is $195.00 less than the Closing Disclosure charged for those items. On information and belief, the difference was not refunded.

36. The Fox Closing Disclosure required the Fox Plaintiffs to initial eleven "Homeowner Acknowledgments," including that the Investment "is not a loan, but rather an Option," that no interest accrues and there are no monthly payments, that Splitero "is not acquiring an immediate interest in my home," that the homeowner may not further encumber the Property without Splitero's written authorization, that the Option "may impact my ability to refinance my mortgage," and that failure to maintain the Property or to keep current on obligations secured by liens on the Property "would constitute a default and could result in Splitero foreclosing on the Property."

37. Contemporaneously, First American Title Company presented the Fox Plaintiffs with amended escrow instructions prepared for the transaction, in which the homeowner acknowledges having entered into "a complex financial arrangement with Splitero Funding, Inc." and agrees not to ask the settlement agent for any explanation of the content, effect, or sufficiency of any of the documents. The same instructions described the transaction to the escrow holder as "a new Conv-Uninsured loan in the amount of $120,000.00." First American's ALTA Settlement Statement identified Splitero as "Lender" and the $120,000 as the "Loan Amount."

38. The $5,988.00 origination charge and the other closing costs were not paid by the Fox Plaintiffs in cash. They were deducted from the $120,000 Investment, that is, financed by Splitero, and the Fox Plaintiffs received the net.

39. Splitero did not provide the Fox Plaintiffs with a list of counseling agencies approved by the United States Department of Housing and Urban Development, did not obtain any counseling certification, did not provide the disclosures required by 15 U.S.C. § 1639(a) at least three business days before consummation, did not provide the reverse mortgage notices and worksheet required by California Civil Code §§ 1923.2 and 1923.5, did not provide a mortgage loan disclosure statement, did not deliver a copy of the appraisal, and

did not make or document any determination of the Fox Plaintiffs' ability to repay.

40. Splitero did provide the Fox Plaintiffs with a "Notice of Right to Cancel" stating: "You are entering into a transaction in which a new security interest in your property will be established. You have the legal right to rescind and to cancel this transaction, without cost, until midnight of the third business day after, whichever of the following events occurs last: (1) the effective date of the transaction ...; or (2) the date you received your Closing Disclosure; or (3) the date you received this notice of your right to cancel." The Notice further states that if there are multiple homeowners, each has the right to cancel, and the exercise of the right by one is effective as to all. That language tracks the rescission framework prescribed for consumer credit transactions secured by a principal dwelling by 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23. Splitero adopted the form of the federal rescission notice because it understood that its product is a credit transaction secured by the consumer's principal dwelling, while omitting the "material disclosures" (the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule) whose delivery is a precondition to the three-business-day period ever beginning to run. 12 C.F.R. § 1026.23(a)(3).

41. Consummation of the Fox transaction occurred on or about October 7, 2024. Splitero funded on or about October 11, 2024, the same day the Deed of Trust and Notice of Option Purchase Agreement were recorded. Following Splitero's scheduled payoff of the Third Federal line of credit, the Third Federal deed of trust, recorded March 7, 2024, as Document No. 2024-0057062, was released of record on November 8, 2024, by Document No. 2024-0311187; Splitero thus retired a prior lender's recorded credit with proceeds of its advance, exactly as a refinancing lender would. The Splitero lien is junior to the Fox Plaintiffs' first mortgage, which is serviced by Freedom Mortgage. On

information and belief, that mortgage is a 30-year loan of $443,239 originated by Amerifirst Financial, Inc., secured by a deed of trust recorded on or about July 31, 2020, as Document No. 2020-0423471, and it matures on August 1, 2050. The title records for the Fox Property also show an earlier deed of trust in favor of Amerifirst Financial, Inc., recorded May 17, 2019, as Document No. 2019-0188416, securing a $450,000 loan. The Option Expiration Date of August 1, 2050, matches the maturity of the first mortgage exactly, and the quarterly statement Splitero issued to the Fox Plaintiffs for July 2026 labels August 1, 2050, the "Maturity Date."

**C. The Turgman Transaction**

42. In or around July or August 2026, Osama Turgman applied to Splitero for an HEI. Splitero did not request or verify income, employment, or ability to repay. Splitero obtained a credit report, for which it charged $91.22, and an automated or exterior appraisal, for which it charged $30.00, and appraised the Turgman Property at $795,734. Splitero offered an Investment of $152,164 in exchange for a 38.24 percent Split Percentage, a 17.99 percent Safety Cap, and an Option Expiration Date of December 1, 2050, a term Splitero's own ledger describes as 24.33 years and 292 months, matched to the maturity of the senior lien.

43. Splitero issued the Turgman OPA and Closing Disclosure with an Effective Date of August 5, 2026. Osama Turgman signed electronically on or about August 6, 2026. No spouse or co-owner signed the OPA, the Deed of Trust, or the Notice of Option Purchase Agreement as a Homeowner. The acknowledgment on the Turgman Deed of Trust and Notice of Option Purchase Agreement was taken on August 6, 2026, by a notary commissioned in Clark County, Nevada, and states that it was "[n]otarized remotely using audio-video communication technology via Proof." There was no in-person signing, no settlement conference, and no explanation of the documents. The transaction

closed on or about August 10, 2026, and Splitero funded on or about August 11, 2026.

44. The Turgman Home Equity Investment Closing Disclosure identifies Splitero Funding, Inc. as the "Investor," First American Title as settlement agent, and states the following terms: Appraised Value $795,734.00; Investment $152,164.00; Split Percentage 38.24 percent, described as "the percentage interest of the Property that Splitero would acquire upon exercise of the Option, or the percentage interest of equity that Splitero shares in the event the Homeowner repurchases the Option"; Option Expiration December 1, 2050; Safety Cap 17.99 percent, described as "the maximum gross rate payable, compounding monthly that Splitero will be entitled to"; and Scheduled Payoffs of $0.00.

45. The Turgman Closing Disclosure itemized the charges as follows, all paid by the homeowner and none by Splitero: "Origination Charge" of $7,592.98, described as "4.99% of Home Equity Investment Amount"; title notary signing fee of $200.00; title insurance policy of $505.00; escrow fee of $605.00; flood determination fee of $3.00; credit report of $91.22; appraisal of $30.00; lender's endorsement of $50.00; recording of the security instrument of $119.00; electronic service fee of $25.00; and an SB2 Atkins fee of $225.00 for the security instrument, for total closing costs of $9,446.20. The entire $9,446.20 was deducted from the Investment, that is, financed by Splitero. "Cash to Homeowner" was $142,717.80. The Closing Disclosure describes itself as "a statement of final terms and closing costs." The recorder's stamp on the Turgman Deed of Trust reflects that the San Diego County Recorder collected total fees of $143.00, including an SB2 Atkins fee of $75.00, which is $201.00 less than the $344.00 the Closing Disclosure charged for recording and the SB2 fee. On information and belief, the difference was not refunded.

46. The Turgman Closing Disclosure required the homeowner to initial eleven "Homeowner Acknowledgments," including that "the Investment is a real estate Option, which is different than a traditional mortgage loan"; that there are no monthly payments; that in a repurchase the homeowner must pay the lesser of the Repurchase Home Value multiplied by the Split Percentage, plus fees, or the Investment compounded monthly at the Safety Cap, plus fees; that the homeowner "may not mortgage or encumber the Property with a lien or any secured obligation that could adversely impact Splitero's lien position" without Splitero's written authorization; that "the Option may impact my ability to refinance my mortgage and that lenders may be unwilling to refinance my mortgage unless I repurchase the Option"; that Splitero "is not acquiring an immediate interest in my home"; and that failure to maintain the Property or to keep current on obligations secured by liens on the Property "would constitute a default and could result in Splitero foreclosing on the Property, exercising the Option, or taking other legal action."

47. The list of disclosures the Turgman Closing Disclosure required the homeowner to acknowledge receiving includes an "Affiliated Business Disclosure," which by its own description "informs Homeowner of Splitero's affiliated business relationship(s)" and "lists range of charges that Splitero's affiliated businesses charge for their services," and a "Notice to Applicant Regarding Credit Score," a notice of the kind federal law requires in connection with loans secured by a dwelling. The list does not include any notice of a right to cancel. On information and belief, Splitero did not deliver to Osama Turgman any notice of the right to rescind.

48. First American Title Company's ALTA Settlement Statement for the Turgman transaction, prepared on its standard borrower form, identifies the "Borrower" as Osama Turgman and the "Lender" as "Splitero Funding, Inc. ISAOA," an abbreviation used in mortgage lending to designate a lender and "its successors

and/or assigns." It states the $152,164.00 under the heading "Loan Amount," lists the $7,592.98 origination charge under "Loan Charges" as "4.99% of Loan Amount (Points)," and records the recording charge as "Record First Deed of Trust." Splitero's own settlement agent, on Splitero's own transaction, documented a loan, from a lender, with points, secured by a deed of trust.

49. The Turgman Deed of Trust, made as of August 5, 2026, names Osama Turgman as Homeowner, First American Title Insurance Company, a Nebraska corporation, as Trustee, and "Splitero Master Trust, as assignee of Splitero Funding, Inc.," as Beneficiary. It contains the same standardized articles as the Fox Deed of Trust: the irrevocable grant "in trust, with power of sale"; the statutory subordination clause warning; the UCC security agreement and fixture filing; the assignment of leases and rents that the Homeowner "irrevocably, absolutely and unconditionally assigns"; the irrevocable power of attorney coupled with an interest; the covenant to pay interest under Civil Code § 3289 on advances; the Default and Foreclosure and Power of Sale article permitting acceleration of "all sums secured" and invocation of the power of sale after a 30-day notice; the Liquidated Damages article incorporating Schedule 2 of the OPA, under which the liquidated sum is computed using the highest Appraised Value; and the provision extending the lien to the Homeowner's entire interest notwithstanding the fractional interest described in the OPA. The Schedule B Notice of Option Purchase Agreement recites that the Option is irrevocable and expires December 1, 2050, and states that it remains of record until released by Splitero or extinguished by operation of law. The Turgman Deed of Trust and Notice were recorded in the Official Records of San Diego County on August 11, 2026, as Document No. 2026-0234608, the day after the closing.

50. With the Turgman Option Documents, Splitero delivered its "Repurchase Home Value Ledger" for the transaction. The Ledger restates the deal terms

(Investment $152,164; Split Percentage 38.24 percent; Safety Cap 17.99 percent, footnoted as a "17.99% annual rate, compounded monthly"; total fees of approximately $9,393; term of 24.33 years) and then presents two tables. The first shows the "Repurchase Amount" the homeowner must pay, year by year, across home values from $640,000 to $3,180,000. It shows, for example, that a homeowner who repurchases at the end of year one must pay $181,912 regardless of home value, an increase of $29,748, or 19.5 percent, over the $152,164 advanced twelve months earlier. The second table is titled "Equivalent Annual Percentage Rate" and is footnoted: "Equivalent Annual Percentage Rate is inclusive of origination fee and third-party costs." It discloses an Equivalent Annual Percentage Rate of 25.72 percent at year one and 22.10 percent at year two in every column, and between 18.65 percent and 20.97 percent at year three. Splitero thus computes, in its own standardized form, an annual percentage rate for the cost of its money, inclusive of its financed fees, while its marketing and its Closing Disclosure tell the homeowner that the product is not a mortgage loan and carries no interest, and while it delivers none of the annual percentage rate disclosures the law requires of lenders.

51. The senior lien on the Turgman Property is a first deed of trust recorded November 18, 2020, as Document No. 2020-0732264, securing a 30-year loan of $483,846 originated by Point Mortgage Corporation, assigned of record by an assignment recorded June 16, 2021, as Document No. 2021-0443153, and now serviced by Wells Fargo. On information and belief, that loan matures on December 1, 2050. The Option Expiration Date of December 1, 2050, matches that maturity exactly, consistent with the Ledger's statement that the term is matched "to the maturity date stated in the recorded senior lien."

52. Splitero did not provide Osama Turgman with any TILA disclosures, any list of HUD-approved counseling agencies, any counseling certification, any

HOEPA disclosures, any reverse mortgage notice, worksheet, list of counselors, or seven-day counseling waiting period, any mortgage loan disclosure statement, or any copy of the appraisal it charged for, and it did not make or document any determination of ability to repay. On information and belief, Splitero performed no income verification of any kind in connection with the Turgman transaction.

**D. The Option Documents Are, in Substance, a Home-Secured Loan**

53. Whatever their labels, the Option Documents have every attribute of credit and none of the attributes of a bona fide option to purchase real property:

a. Splitero advances money at the outset of the transaction. A purchaser under a true option pays consideration for the option and then pays the purchase price if and when it exercises. Splitero pays nothing at exercise; it is repaid.

b. The homeowner is obligated to pay Splitero a sum in the future, the Total Repurchase Amount, measured by the amount advanced, by the passage of time (the Safety Cap compounds monthly), and by the value of the collateral. That is a debt bearing a charge for the use of money. California law expressly recognizes value-contingent charges of this kind as "interest" in home-secured lending. Cal. Civ. Code § 1923.2(b).

c. The obligation is secured by a recorded Deed of Trust with power of sale on the consumer's principal dwelling, together with an assignment of rents, a fixture filing, and a power of attorney. An option confers no right to foreclose.

d. Splitero's remedies on default are a lender's remedies: acceleration of all sums secured; nonjudicial foreclosure; collection of rents without notice; Protective Advances bearing 10 percent interest; recovery of attorneys' fees, including fees of in-house counsel; specific performance and injunctive relief without bond; and a Liquidated Damages figure equal to the Total

Repurchase Amount computed at the highest appraised value the Property has ever had. The OPA even reserves to Splitero a contractual claim against the homeowner for any amount Splitero is required to disgorge in a bankruptcy of the homeowner.

e. The homeowner bears every burden and risk of ownership during the term, and Splitero bears none. The homeowner must maintain, insure, and pay taxes on the Property, keep senior liens current, obtain Splitero's written consent before any new lien attaches, submit to appraisals at the homeowner's expense, and indemnify Splitero. If the homeowner fails to cooperate with an appraisal, Splitero may set the Repurchase Home Value itself.

f. Splitero's principal is secured rather than placed at hazard. Splitero is exposed to loss of any portion of its advance only if the value of the Property falls by roughly half, and it has contracted for the right to protect its collateral against every other risk. The only contingency affecting Splitero's return beyond the Safety Cap is the adequacy of the collateral, which is the risk that exists in every secured loan.

g. The obligation has a fixed maturity date, the Option Expiration Date, on which, absent an earlier sale, Splitero may exercise the "Option," take a tenancy in common interest, and force a sale of the entire Property, including the homeowner's interest, paying itself the Split Percentage of the gross sale price after costs and senior liens. The Option Documents thus require a single balloon payment at maturity, many times larger than any earlier scheduled payment, of which there are none.

h. The homeowner is personally liable, with recourse, for Protective Advances and interest, administrative and third-party fees, indemnity, attorneys' fees, and monetary damages upon default. Only the nominal

Investment is described as nonrecourse, and even that description yields to the repayment obligations of the OPA.

i. Splitero itself treats the transaction as a mortgage loan when doing so serves its interests: it instructs escrow to close a conventional uninsured loan; its settlement agent identifies Splitero as "Lender," the advance as the "Loan Amount," and the 4.99 percent charge as "Points"; it obtains an ALTA lender's title policy with a lender's endorsement; it records a deed of trust bearing the statutory subordination warning; it delivered a TILA-style rescission notice in the Fox transaction and defines "Business Day" in every OPA with the special rescission definition ("For rescission purposes, business day includes Saturdays, but not Sundays or legal public holidays"), language that has meaning only under 12 C.F.R. § 1026.2(a)(6); it obtains credit reports and issues credit score notices; it holds a Department of Real Estate license and an NMLS identifier of the kind required of persons who make and arrange loans secured by real property; it computes an "Equivalent Annual Percentage Rate" for each transaction; and it finances its originations through rated securitizations of the kind used for mortgage receivables.

54. The Option Documents are therefore a "consumer credit transaction," "credit," and a "residential mortgage loan" within the meaning of 15 U.S.C. §§ 1602(f), (i), and (dd)(5) and 12 C.F.R. § 1026.2(a), because they grant the consumer the right to incur a debt and defer its payment and are secured by a deed of trust on the consumer's principal dwelling. They are not a "reverse mortgage transaction" under 15 U.S.C. § 1602(cc) and 12 C.F.R. § 1026.33, because the Total Repurchase Amount is due at a fixed Option Expiration Date irrespective of transfer, cessation of occupancy, or death, so no federal reverse mortgage exemption applies.

55. The Option Documents are a "high-cost mortgage" under 15 U.S.C. § 1602(bb) and 12 C.F.R. § 1026.32(a). In the Fox transaction, the points and fees include at minimum the $5,988.00 origination charge retained by Splitero, and the total loan amount, computed as the amount financed net of the financed origination charge, is $114,012.00, five percent of which is $5,700.60. In the Turgman transaction, the points and fees include at minimum the $7,592.98 origination charge retained by Splitero, and the total loan amount so computed is $144,571.02, five percent of which is $7,228.55. In each transaction, and on information and belief in every transaction priced with Splitero's uniform 4.99 percent origination charge deducted from the advance, the points and fees exceed five percent of the total loan amount. 12 C.F.R. § 1026.32(a)(1)(ii), (b)(4). On information and belief, each transaction also exceeds the annual percentage rate trigger, because the cost of the credit, whether measured by Splitero's own Equivalent Annual Percentage Rate table, by the Safety Cap compounded monthly, or by the day-one doubling of the value taken against the value advanced, exceeds the average prime offer rate for a comparable transaction by more than 6.5 percentage points for a first-lien transaction and 8.5 percentage points for a subordinate-lien transaction. 12 C.F.R. § 1026.32(a)(1)(i).

56. Under California law the Option Documents are likewise a "loan": the delivery of a sum of money under an agreement to return, at a future time, that sum together with an additional sum for its use, assessed, as California law requires, "with a view to substance rather than form." *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 800 (1994). They also meet every element of a "reverse mortgage" under California Civil Code § 1923: they provide cash advances to a borrower based on the equity or the value in the borrower's owner-occupied principal residence; they require no payment of principal or interest until the entire obligation becomes due and payable; and they are made by a lender that

represents itself to be licensed under the laws of this State. Section 1923 contains no age qualification. In the alternative, if the loans were not made by a licensed lender, Defendants made consumer loans without the license required by the California Financing Law.

**E. Splitero Systematically Withholds the Disclosures and Protections the Law Requires for Home-Secured Credit**

57. Because Splitero has decided that its loans are not loans, it does not comply with any of the laws that govern them. On information and belief, and consistent with the standardized form documents used in both the Fox and Turgman transactions, Splitero uniformly, as a matter of standard practice with every Class member:

a. fails to provide the disclosures required by 15 U.S.C. § 1638 and 12 C.F.R. §§ 1026.18, 1026.19, 1026.37, and 1026.38, including the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule;

b. fails to deliver the material disclosures and a compliant notice of the right to rescind under 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23, so that the rescission period never begins to run and continues until three years after consummation;

c. fails to make any determination, let alone a reasonable and good faith determination based on verified and documented information, that the consumer has a reasonable ability to repay the loan according to its terms, in violation of 15 U.S.C. § 1639c(a) and 12 C.F.R. § 1026.43, and instead extends credit based on the consumer's equity in the dwelling, which the statute expressly excludes from the determination;

d. fails to obtain certification that the consumer received counseling from a HUD-approved counselor on the advisability of the mortgage, in violation of 15 U.S.C. § 1639(u) and 12 C.F.R. § 1026.34(a)(5);

e. fails to provide the disclosures required by 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c) at least three business days before consummation;

f. structures the loan with a single balloon payment at maturity, in violation of 15 U.S.C. § 1639(e) and 12 C.F.R. § 1026.32(d)(1)(i);

g. directly finances its points and fees by deducting them from the advance, in violation of 15 U.S.C. § 1639(m)(2) and 12 C.F.R. § 1026.34(a)(10);

h. engages in a pattern or practice of extending high-cost credit based on the consumer's collateral without regard to repayment ability, in violation of 15 U.S.C. § 1639(h);

i. includes in every residential mortgage loan terms requiring arbitration and waiving the consumer's right to proceed in court and on a class basis, in violation of 15 U.S.C. § 1639c(e) and 12 C.F.R. § 1026.36(h);

j. fails to provide the list of at least ten HUD-approved counseling agencies, the counseling certification, and the seven-day counseling waiting period required by California Civil Code § 1923.2(j) and (k), and fails to provide the notices and worksheet required by California Civil Code § 1923.5;

k. fails to provide the mortgage loan disclosure statement required by California Business and Professions Code §§ 10240 and 10241 for loans negotiated by real estate licensees, and fails to deliver the copy of the appraisal required by § 10241.3 when a borrower is charged an appraisal fee; and

l. fails to make the shared appreciation loan disclosures, and disregards the measurement limits, prescribed by California Civil Code § 1917 et seq., under which contingent deferred interest lawfully may be taken only as a share of appreciation, not of gross value.

**F. Splitero's Marketing and Documents Are Deceptive**

58. Splitero represents to the public on its website, in advertising, in its loan documents, and through its originators that its HEI is "not a loan," that it

involves no interest and no monthly payments, that it creates no new debt, and that Splitero is merely purchasing the right to acquire an undivided percentage interest in the home in the future.

59. Those representations are false and misleading and are likely to deceive a reasonable consumer, for the reasons alleged in Section D above. The HEI is a home-secured loan. The Total Repurchase Amount includes a charge for the use of money, computed by a compound interest formula, that California law labels interest when it is contingent on the value of the property, and that Splitero itself labels an "Equivalent Annual Percentage Rate" in its own ledger. The homeowner incurs new, secured debt, with personal recourse as to fees and advances, on the day the homeowner signs.

60. The representations are material. They go to the fundamental nature of the transaction, to the cost of the money advanced, and to the risk of losing one's home. They are designed to induce, and do induce, homeowners who would not sign a loan document disclosing an annual percentage rate near or above 20 percent, a balloon payment, and a power of sale deed of trust, to sign documents that impose exactly those terms.

61. Plaintiffs read or heard, and relied on, Splitero's representations that the transaction was not a loan, would not accrue interest, and would create no new debt, and they would not have entered into the transactions, or would have done so only on materially different terms, had Splitero disclosed the transactions' true nature and cost.

**G. The Arbitration, Jury Waiver, and Class Waiver Provisions Are Void**

62. Section 11.22 of the OPA, printed in capital letters in the same form in the Fox and Turgman transactions, purports to require that "ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT," including "THE DETERMINATION OF THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE," be resolved

by binding arbitration administered by JAMS, in the city of at least 300,000 population closest to the Property. It requires the parties to maintain the confidentiality of the proceedings and the award. It provides that the costs of arbitration and reasonable counsel fees "WILL BE BORNE BY THE PARTY DETERMINED BY THE ARBITRATOR TO BE THE NON-PREVAILING PARTY." It states that the parties "WAIVE ANY RIGHTS THEY MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION OR IN A PRIVATE ATTORNEY GENERAL CAPACITY." And it excepts from arbitration "SPLITERO'S EXERCISE OF REMEDIES UNDER THIS AGREEMENT OR THE SECURITY INSTRUMENT," reserving the courts, and the nonjudicial foreclosure process, for Splitero alone. Section 11.21 purports to waive trial by jury.

63. Those provisions are void and unenforceable. Section 1414 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, codified at 15 U.S.C. § 1639c(e)(1), provides that no residential mortgage loan "may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction." Section 1639c(e)(3) provides that no provision of a residential mortgage loan, and no other agreement between the consumer and the creditor relating to it, "shall be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States, or any other court of competent jurisdiction," under section 1640 or any other provision of law. Regulation Z implements the same prohibitions. 12 C.F.R. § 1026.36(h).

64. Because the Option Documents constitute residential mortgage loans, Section 11.22 is a term Congress has declared may not be included in the contract, and it may not be applied or interpreted to bar this action. Whether the Option Documents are residential mortgage loans is a question for this Court, not for an arbitrator: Congress has withdrawn residential mortgage loan disputes from

private ordering; a purported delegation clause cannot delegate a question Congress has reserved to the courts; and the OPA does not clearly and unmistakably delegate arbitrability in any event, because its broad delegation language is contradicted by its express carve out of an entire category of disputes, Splitero's enforcement remedies, from arbitration.

65. Independently, the purported waiver of the right to proceed "in a private attorney general capacity" is invalid and unenforceable under California law to the extent it would preclude Plaintiffs from seeking public injunctive relief under the Unfair Competition Law or the False Advertising Law in any forum, and the Federal Arbitration Act does not preempt that rule. *McGill v. Citibank*, N.A., 2 Cal. 5th 945, 952, 961 to 962 (2017).

66. Independently, Sections 11.21 and 11.22 are procedurally and substantively unconscionable under California Civil Code § 1670.5. They are terms of adhesion, not negotiable, presented in a signing stack of more than 60 pages, in the Turgman transaction through a remote video notarization with no one present to answer questions and an escrow instruction forbidding questions to the settlement agent in the Fox transaction. They are one-sided, exempting the drafter's foreclosure and enforcement claims while compelling arbitration of the consumer's claims. They impose confidentiality that shields Splitero's standardized practices from public scrutiny. And they impose a loser-pays fee regime on statutory consumer claims that carry one way fee shifting in the consumer's favor.

## H. Securitization and Assignment of the Loans

67. Splitero originates HEI loans through Splitero Funding, Inc. and immediately assigns them: the Beneficiary named on each recorded Deed of Trust is Splitero Master Trust, "as assignee of Splitero Funding, Inc." On information and belief, Splitero thereafter sells, pledges, or assigns the loans, or interests in them, to warehouse lenders, forward purchasers, and securitization vehicles,

including Defendant Splitero Trust 2025-1, which closed a rated securitization of approximately $283.3 million in late 2025, and Defendant Splitero Trust 2026-1, which closed a rated securitization of approximately $296 million in May 2026. Wilmington Trust, National Association acts as trustee or custodian in connection with these arrangements.

68. Each such trust or vehicle is an assignee of a consumer credit transaction secured by real property. The violations alleged in this Complaint are apparent on the face of the disclosure statements and the assigned documents themselves: the Closing Disclosures state the financed origination charge and disclose no annual percentage rate, no finance charge, and none of the required terms, and the Option Documents disclose the balloon structure, the compounding Safety Cap, and the arbitration clause. 15 U.S.C. § 1641(a), (e). Because the loans are high-cost mortgages, each assignee is also subject to all claims and defenses that the consumer could assert against the creditor, to the extent provided by 15 U.S.C. § 1641(d). Each consumer's right of rescission is effective against every assignee. 15 U.S.C. § 1641(c).

**I. Delayed Discovery and Tolling**

69. Plaintiffs and the Class members did not discover, and could not in the exercise of reasonable diligence have discovered, the facts giving rise to their claims at consummation, because Splitero affirmatively represented that the transaction was not a loan, carried no interest, and created no new debt; because Splitero withheld the very disclosures (an annual percentage rate, a finance charge, a total of payments) that would have revealed the cost and nature of the credit; because Splitero's Closing Disclosure required homeowners to initial statements adopting Splitero's characterization; and because the escrow instructions Splitero's settlement agent presented directed homeowners not to seek any explanation of the documents. These acts of concealment were self-concealing and were intended to and did prevent discovery of the claims.

70. All applicable statutes of limitations are therefore tolled by the discovery rule, by fraudulent concealment, and by equitable tolling, from consummation until a reasonable time after each Class member discovered or could have discovered the true nature of the transaction. Plaintiffs discovered the facts within the applicable periods before filing. In addition, and independently: the rescission rights asserted below arise within three years of consummation for the Fox Plaintiffs and within both the three-business-day and three-year periods for Osama Turgman; claims under 15 U.S.C. §§ 1639, 1639b, and 1639c carry a three-year limitations period under 15 U.S.C. § 1640(e); and Plaintiffs and the Class in any event preserve all rights of recoupment and setoff under 15 U.S.C. § 1640(k), which applies without regard to any limitations period.

## CLASS ACTION ALLEGATIONS

71. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), individually and on behalf of the following classes and subclasses (collectively, the "Class"):

a. Nationwide TILA Class: All natural persons who, at any time from three years before the filing of this Complaint through the date of class certification, entered into a Splitero Option Purchase Agreement or substantially similar home equity investment agreement with any Defendant secured by a deed of trust, mortgage, or equivalent security interest on the person's principal dwelling.

b. Rescission Subclass: All members of the Nationwide TILA Class whose transaction was consummated within three years before the filing of this Complaint, or thereafter, and who have not sold or transferred all of their interest in the secured dwelling.

c. High-Cost Mortgage Subclass: All members of the Nationwide TILA Class whose transaction included an origination charge or other points and fees exceeding five percent of the total loan amount as computed under 12

C.F.R. § 1026.32(b)(4), including without limitation all members whose Closing Disclosure reflects Splitero's standard origination charge of 4.99 percent of the Investment deducted from the advance.

d. Arbitration Clause Class: All natural persons who entered into a Splitero Option Purchase Agreement containing Section 11.21 or Section 11.22, or any materially similar jury waiver, arbitration, class waiver, or private attorney general waiver provision, whose agreement has not been fully terminated.

e. California Class: All natural persons who, at any time from four years before the filing of this Complaint through the date of class certification, entered into a Splitero Option Purchase Agreement or substantially similar home equity investment agreement with any Defendant secured by a deed of trust on the person's principal dwelling located in California.

72. Excluded from the Class are Defendants; their officers, directors, employees, and affiliates; any entity in which any Defendant has a controlling interest; the judicial officers to whom this action is assigned and their immediate families; and counsel for the parties.

73. Numerosity. The Class is so numerous that joinder of all members is impracticable. Splitero has publicly reported rated securitizations of HEI agreements totaling more than half a billion dollars, including the approximately $283.3 million Splitero Trust 2025-1 transaction in late 2025 and the approximately $296 million Splitero Trust 2026-1 transaction in May 2026, and offers its product in at least fourteen states, including California, where it reports rapid growth in San Diego, Orange, and Riverside Counties. On information and belief, the Class includes thousands of homeowners and the California Class includes many hundreds. Class members are readily identifiable from Defendants' records and from the public record, in which

every Class member's Deed of Trust and Notice of Option Purchase Agreement is recorded.

74. Commonality and predominance. There are questions of law and fact common to the Class that predominate over any individual questions, including: (a) whether the Option Documents constitute a consumer credit transaction, a residential mortgage loan, and a high-cost mortgage under TILA and HOEPA; (b) whether Defendants are creditors or assignees under TILA; (c) whether Defendants failed to provide the disclosures required by TILA and HOEPA; (d) whether Defendants failed to make ability-to-repay determinations; (e) whether Defendants' loans contain prohibited balloon payments and financed points and fees; (f) whether Defendants failed to obtain counseling certifications; (g) whether the arbitration, jury waiver, and class waiver provisions are void under 15 U.S.C. § 1639c(e); (h) whether the Option Documents constitute a loan, a reverse mortgage, and a shared appreciation loan under California law; (i) whether the Safety Cap and the Split Percentage are interest; (j) whether Defendants' representations that the HEI is not a loan and involves no interest are false or misleading; (k) whether Defendants' practices are unlawful, unfair, or fraudulent under the Unfair Competition Law; (l) whether the recorded Deeds of Trust and Notices are subject to cancellation; and (m) the appropriate measure and form of classwide relief. Because Splitero uses standardized form documents, standardized pricing, standardized marketing, and standardized underwriting, these questions will be resolved by common proof.

75. Typicality. Plaintiffs' claims are typical of the claims of the Class. The case presents two standardized California originations, 22 months apart, on the same form architecture: the same OPA articles, the same Deed of Trust articles, the same Closing Disclosure acknowledgments, the same 4.99 percent financed origination charge, the same two-to-one ratio of Split Percentage to the

percentage of value advanced, the same monthly compounding Safety Cap structure, the same omission of every required credit disclosure, and the same arbitration, jury waiver, and class waiver provisions. Plaintiffs' claims arise from the same course of conduct and are based on the same legal theories as those of every other Class member.

76. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to the Class, and they have retained counsel experienced in consumer credit litigation and class litigation in this District. Nathanial Fox and Osama Turgman will serve as the class representatives. Sarah M. Fox is also named as a plaintiff, though not as a proposed class representative, because she is an owner of the encumbered Fox Property, a signatory of the Option Documents, and the holder of an independent rescission right under 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23(a)(1), which provides that each consumer whose ownership interest is subject to the security interest may rescind and that rescission by one is effective as to all. The claims asserted here arise from standardized form contracts and uniform omissions, so the personal financial circumstances of any individual representative would not defeat the typicality or predominance of the classwide claims.

77. Rule 23(b)(2). Defendants have acted and refused to act on grounds generally applicable to the Class, in that Defendants uniformly treat their loans as exempt from federal and California credit law, uniformly record and maintain the same form security instruments, and uniformly include void arbitration and class waiver provisions in their contracts, so that final declaratory and injunctive relief with respect to the Class as a whole is appropriate.

78. Rule 23(b)(3) and (c)(4). Common questions predominate, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual Class members' claims are, in relation to the cost of

litigating against an institutional defendant with substantial funding, too small to justify individual litigation; Defendants have attempted to foreclose individual litigation altogether through the arbitration provision; and concentrating the litigation in this District, where Defendants are headquartered, will avoid inconsistent adjudications of the threshold question whether Splitero's product is a loan. In the alternative, the threshold recharacterization question and the validity of the arbitration, jury waiver, and class waiver provisions may be certified as particular issues under Rule 23(c)(4).

## I.

## FIRST CAUSE OF ACTION

### Rescission and Related Relief Under the Truth in Lending Act

### 15 U.S.C. §§ 1635, 1640; 12 C.F.R. § 1026.23

### (Against All Defendants, on Behalf of All Plaintiffs and the Rescission Subclass)

79. Plaintiffs reallege and incorporate by reference every allegation above.

80. Each transaction was a consumer credit transaction in which a security interest was retained or acquired in property used as the principal dwelling of the consumers, within the meaning of 15 U.S.C. § 1635(a) and 12 C.F.R. § 1026.23(a). The transactions were not residential mortgage transactions under 15 U.S.C. § 1602(w), because the advances did not finance the acquisition or initial construction of the dwellings, and were not otherwise exempt under 12 C.F.R. § 1026.23(f).

81. Defendants failed to deliver to Plaintiffs and the Rescission Subclass the material disclosures required by TILA, namely the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in 12 C.F.R. §§ 1026.32(c) and (d) and 1026.43(g), and failed to deliver a compliant notice of the right to rescind under 12 C.F.R. § 1026.23(b). The Fox notice did not

accompany, and was contradicted by, documents denying that the transaction was credit, and no material disclosures were ever delivered. On information and belief, no rescission notice of any kind was delivered in the Turgman transaction.

82. Because the required notice and material disclosures were never delivered, the right of rescission of each Plaintiff and each member of the Rescission Subclass did not expire three business days after consummation, but continues until three years after consummation, or transfer or sale of the property, whichever occurs first. 15 U.S.C. § 1635(f); 12 C.F.R. § 1026.23(a)(3).

83. Plaintiffs hereby exercise their rights to rescind their transactions. This Complaint constitutes written notice of rescission to Defendants under 15 U.S.C. § 1635(a) and 12 C.F.R. § 1026.23(a)(2). Rescission by each Plaintiff is effective as to all consumers in that Plaintiff's transaction. 12 C.F.R. § 1026.23(a)(4). Plaintiffs are ready, willing, and able to tender the net proceeds of their transactions upon Defendants' performance of their statutory obligations, in such manner and on such terms as the Court may order, including through a sale, refinance, or payment plan, and Plaintiffs request that the Court modify rescission procedures as equity requires.

84. Upon rescission, Plaintiffs are not liable for any finance or other charge, and the security interests, the Deeds of Trust and the recorded Notices of Option Purchase Agreement, are void. 15 U.S.C. § 1635(b); 12 C.F.R. § 1026.23(d)(1). Within 20 calendar days after receipt of notice of rescission, Defendants must return all money given in connection with the transactions, including the $5,988.00 and $7,592.98 origination charges and all other charges, and must take all action necessary to reflect the termination of the security interests. 12 C.F.R. § 1026.23(d)(2).

85. Any failure by Defendants to honor rescission will constitute a further violation of 15 U.S.C. § 1635 for which Plaintiffs and the Rescission Subclass are

entitled to actual damages, statutory damages, and attorneys' fees under 15 U.S.C. § 1640(a).

86. Splitero Master Trust, the Securitization Trusts, and DOES 1 through 10, as assignees, are subject to rescission to the same extent as the originating creditor. 15 U.S.C. § 1641(c).

## II.

## SECOND CAUSE OF ACTION

## Damages for Disclosure Violations Under the Truth in Lending Act

## 15 U.S.C. §§ 1638, 1640; 12 C.F.R. §§ 1026.17, 1026.18, 1026.19

## (Against All Defendants, on Behalf of All Plaintiffs and the Nationwide TILA Class)

87. Plaintiffs reallege and incorporate by reference every allegation above.

88. In each Class transaction, Defendants extended closed-end consumer credit secured by the consumer's principal dwelling and failed to make the disclosures required by 15 U.S.C. § 1638 and 12 C.F.R. §§ 1026.17 through 1026.19, 1026.37, and 1026.38, including the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule, and failed to make them in the required form and at the required times.

89. Defendants are liable to each Class member whose claim is timely, including through the tolling alleged above, for actual damages, statutory damages of up to $4,000 per violation, and, in a class action, statutory damages up to the lesser of $1,000,000 or one percent of Defendants' net worth, together with costs and attorneys' fees. 15 U.S.C. § 1640(a). The Turgman claim accrued in August 2026 and is timely on its face. The Fox claim is timely by reason of the discovery rule, fraudulent concealment, and equitable tolling alleged above, and is in all events preserved by recoupment and setoff under 15 U.S.C. § 1640(k).

90. Splitero Master Trust, the Securitization Trusts, and DOES 1 through 10 are liable as assignees because the violations are apparent on the face of the disclosure statements and assigned documents. 15 U.S.C. § 1641(a), (e).

**III.**

**THIRD CAUSE OF ACTION**

**Violations of the Home Ownership and Equity Protection Act**

**15 U.S.C. §§ 1639, 1640; 12 C.F.R. §§ 1026.32, 1026.34**

**(Against All Defendants, on Behalf of All Plaintiffs, the Nationwide TILA Class, and the High-Cost Mortgage Subclass)**

91. Plaintiffs reallege and incorporate by reference every allegation above.

92. Each transaction is a high-cost mortgage within the meaning of 15 U.S.C. § 1602(bb) and 12 C.F.R. § 1026.32(a), for the reasons alleged above: the uniform 4.99 percent financed origination charge alone exceeds five percent of the total loan amount as Regulation Z computes it, and on information and belief the annual percentage rate exceeds the average prime offer rate for comparable transactions by more than the applicable threshold.

93. Defendants violated 15 U.S.C. § 1639 and Regulation Z with respect to Plaintiffs and each Class member by: (a) extending high-cost mortgages without first receiving certification from a HUD-approved counselor that the consumer received counseling on the advisability of the mortgage, 15 U.S.C. § 1639(u); 12 C.F.R. § 1026.34(a)(5); (b) failing to provide the disclosures required by 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c) at least three business days before consummation; (c) structuring the obligation so that the payment due at the Option Expiration Date is more than two times any regular periodic payment, of which there are none, 15 U.S.C. § 1639(e); 12 C.F.R. § 1026.32(d)(1)(i); (d) directly financing points and fees by deducting them from the advance, 15 U.S.C. § 1639(m)(2); 12 C.F.R. § 1026.34(a)(10); and (e)

engaging in a pattern or practice of extending high-cost credit based on the consumers' collateral without regard to repayment ability, 15 U.S.C. § 1639(h).

94. This claim is timely under 15 U.S.C. § 1640(e), which provides a three-year limitations period for violations of section 1639. The Fox transaction closed in October 2024 and the Turgman transaction closed in August 2026, each within three years of the filing of this action.

95. Under 15 U.S.C. § 1640(a)(1), (a)(2), (a)(3), and (a)(4), Defendants are liable for actual damages, statutory damages, costs and attorneys' fees, and enhanced damages equal to the sum of all finance charges and fees paid by the consumer, unless Defendants demonstrate that the failures to comply were not material. Splitero Master Trust, the Securitization Trusts, and DOES 1 through 10 are additionally subject to all claims and defenses as assignees of high-cost mortgages under 15 U.S.C. § 1641(d).

## IV.

## FOURTH CAUSE OF ACTION

### Violation of the Ability-to-Repay Requirement

### 15 U.S.C. §§ 1639c(a), 1640; 12 C.F.R. § 1026.43

### (Against All Defendants, on Behalf of All Plaintiffs and the Nationwide TILA Class)

96. Plaintiffs reallege and incorporate by reference every allegation above.

97. Each transaction is a residential mortgage loan within the meaning of 15 U.S.C. § 1602(dd)(5) and a covered transaction under 12 C.F.R. § 1026.43(b)(1).

98. Defendants made the loans without making any reasonable and good faith determination, based on verified and documented information, that the consumers had a reasonable ability to repay the loans according to their terms together with all applicable taxes, insurance, and assessments, and without verifying income or assets through tax returns, wage statements, payroll

receipts, financial institution records, or other reliable third-party documents, in violation of 15 U.S.C. § 1639c(a)(1), (3), and (4) and 12 C.F.R. § 1026.43(c). Defendants underwrote to the collateral alone, advertising credit scores as low as 500 with no income verification, and extended credit based on the consumers' equity in their dwellings, which 15 U.S.C. § 1639c(a)(3) expressly excludes from the determination.

99. This claim is timely under 15 U.S.C. § 1640(e), which provides a three-year limitations period for violations of section 1639c.

100. Under 15 U.S.C. § 1640(a), Defendants are liable for actual damages, statutory damages, enhanced damages equal to the sum of all finance charges and fees paid, and costs and attorneys' fees. Plaintiffs and the Class also expressly preserve the right to assert violations of section 1639c as a matter of defense by recoupment or setoff, without regard to any limitations period, in any action to collect the debt or to foreclose, pursuant to 15 U.S.C. § 1640(k).

**V.**

**FIFTH CAUSE OF ACTION**

**Assignee Liability Under the Truth in Lending Act**

**15 U.S.C. § 1641(a), (c), (d), (e)**

**(Against Splitero Master Trust, Splitero Trust 2025-1, Splitero Trust 2026-1, and DOES 1 through 10, on Behalf of All Plaintiffs and the Nationwide TILA Class)**

101. Plaintiffs reallege and incorporate by reference every allegation above.

102. Splitero Master Trust is the recorded Beneficiary and assignee of each Class member's Deed of Trust. The Securitization Trusts and DOES 1 through 10 are, on information and belief, purchasers, assignees, or pledgees of Class members' loans or of interests in them, and Wilmington Trust, National Association holds or administers those interests as trustee or custodian.

103. The TILA and HOEPA violations alleged in this Complaint are apparent on the face of the disclosure statements and the assigned documents: the absence of every required disclosure, the financed points and fees, the balloon structure, the compounding Safety Cap, and the prohibited arbitration and waiver terms all appear in the standardized Option Documents themselves. Each voluntary assignee is therefore liable to the same extent as the originating creditor under 15 U.S.C. § 1641(a) and (e), is subject to rescission under 15 U.S.C. § 1641(c), and, because the loans are high-cost mortgages, is subject to all claims and defenses the consumer could assert against the creditor under 15 U.S.C. § 1641(d), to the limits stated in § 1641(d)(2).

104. Plaintiffs seek a determination that every trust, vehicle, and custodian holding Class loans is bound by the rescission, damages, and declaratory relief awarded in this action, and Plaintiffs preserve all rights under 15 U.S.C. § 1640(k) against any assignee that seeks to collect or foreclose.

## VI.
## SIXTH CAUSE OF ACTION
## Declaratory Relief: The Arbitration, Jury Waiver, and Class Waiver Provisions Are Void
## 28 U.S.C. §§ 2201 and 2202; 15 U.S.C. § 1639c(e); 12 C.F.R. § 1026.36(h)
## (Against All Defendants, on Behalf of All Plaintiffs and the Arbitration Clause Class)

105. Plaintiffs reallege and incorporate by reference every allegation above.

106. An actual, present, and justiciable controversy exists between Plaintiffs and the Class, on the one hand, and Defendants, on the other, concerning: (a) whether the Option Documents constitute consumer credit transactions and residential mortgage loans subject to TILA, HOEPA, and Regulation Z; (b) whether Sections 11.21 and 11.22 of the OPA and every similar provision are void and

unenforceable under 15 U.S.C. § 1639c(e) and 12 C.F.R. § 1026.36(h) and unenforceable under McGill v. Citibank, N.A., 2 Cal. 5th 945 (2017), and Civil Code § 1670.5; and (c) whether Defendants may enforce the Deeds of Trust, the Notices of Option Purchase Agreement, and the Options without first complying with federal and California credit law. Defendants contend their product is not a loan; Plaintiffs contend the opposite. Defendants have recorded liens against the homes of every Class member on the basis of their contention and have reserved the right to foreclose.

107. Plaintiffs and the Class are entitled to a declaration that: (a) the Option Documents are consumer credit transactions, residential mortgage loans, and high-cost mortgages within the meaning of TILA, HOEPA, and Regulation Z, and loans, reverse mortgages, and shared appreciation obligations under California law; (b) Sections 11.21 and 11.22 of the OPA, and every other provision of the Option Documents requiring arbitration or any other nonjudicial procedure, waiving trial by jury, or waiving the right to proceed on a class, collective, or representative basis or in a private attorney general capacity, are void and may not be applied or interpreted to bar this action or any Class member's action; and (c) Defendants may not exercise the Option, declare a default, accelerate, or foreclose against any member of the Rescission Subclass who has exercised or timely exercises the right of rescission.

108. Plaintiffs and the Class are further entitled to such additional relief based on the declaration as may be necessary or proper under 28 U.S.C. § 2202, including an injunction prohibiting Defendants from invoking Sections 11.21 and 11.22 against any Class member.

## VII.

## SEVENTH CAUSE OF ACTION

## Violations of the Real Estate Settlement Procedures Act (Pleaded in the Alternative)

## 12 U.S.C. §§ 2607, 2614; Regulation X, 12 C.F.R. Part 1024

## (Against Splitero Funding, Inc., Splitero, Inc., and DOES 1 through 10, on Behalf of All Plaintiffs and the Nationwide TILA Class)

109. Plaintiffs reallege and incorporate by reference every allegation above. This claim is pleaded in the alternative and only to the extent supported by facts developed in discovery concerning Splitero's affiliated business arrangements.

110. Because the Option Documents are loans secured by first or subordinate liens on residential real property designed principally for the occupancy of one to four families, made by a creditor regulated under federal law and by a lender that makes or invests in residential real estate loans, each transaction is a "federally related mortgage loan" within the meaning of 12 U.S.C. § 2602(1).

111. Splitero's own Closing Disclosure acknowledges the existence of "Splitero's affiliated business relationship(s)" with providers of settlement services and of a "range of charges that Splitero's affiliated businesses charge for their services." On information and belief, in connection with Class transactions, Splitero and its affiliates gave and accepted fees, kickbacks, or things of value pursuant to agreements or understandings that settlement service business would be referred to particular providers, and gave and accepted portions, splits, or percentages of charges made for settlement services other than for services actually performed, including portions of title, escrow, notary, appraisal, and other charges uniformly imposed on Class members, in violation of 12 U.S.C. § 2607(a) and (b), and did so outside the conditions that 12 U.S.C. § 2607(c)(4) imposes on affiliated business arrangements.

112. Persons who violate 12 U.S.C. § 2607 are jointly and severally liable to each person charged for the settlement service in an amount equal to three times the charge paid, together with costs and attorneys' fees. 12 U.S.C. § 2607(d)(2), (d)(5). The Turgman claim, arising from an August 2026 closing, is timely under 12 U.S.C. § 2614. The claims of the Fox Plaintiffs and other Class members are timely by reason of the tolling alleged above. Plaintiffs do not assert any claim under Regulation X for which no private right of action exists; conduct violating those provisions is pleaded as a predicate under the Unfair Competition Law below.

## VIII.

## EIGHTH CAUSE OF ACTION

### Violation of the California Reverse Mortgage Law

### Cal. Civ. Code §§ 1923 through 1923.10

### (Against All Defendants, on Behalf of All Plaintiffs and the California Class)

113. Plaintiffs reallege and incorporate by reference every allegation above.

114. Each California transaction is a "reverse mortgage" as California defines it: a loan, nonrecourse as to the advance, secured by real property, that (a) provides cash advances to a borrower based on the equity or the value in the borrower's owner-occupied principal residence, (b) requires no payment of principal or interest until the entire obligation becomes due and payable, and (c) is made by a lender that holds or claims a license issued under the laws of this State. Cal. Civ. Code § 1923. The statute's treatment of "interest that is contingent on the value of the property upon execution of the loan or at maturity, or on changes in value between closing and maturity," Cal. Civ. Code § 1923.2(b), describes the Split Percentage and Safety Cap structure exactly.

115. Defendants violated the Reverse Mortgage Law with respect to each California Class member by, among other things: failing to provide the list of not fewer than ten HUD-approved counseling agencies required by § 1923.2(j); accepting

final applications and assessing fees without receiving a counseling certification and without the lapse of seven days from counseling, in violation of § 1923.2(k); failing to provide the plain language "Important Notice to Reverse Mortgage Loan Applicant" in conspicuous type and the "Reverse Mortgage Worksheet Guide" required by § 1923.5; and failing to conform the loan instruments to the requirements of the chapter.

116. Plaintiffs and the California Class seek declaratory relief establishing that the Option Documents are reverse mortgages subject to the chapter and that Defendants' uniform practices violate it; injunctive relief conforming Defendants' conduct to the chapter; and all remedies available by statute and in equity. These violations are also pleaded as unlawful acts under the Unfair Competition Law below.

**IX.**

**NINTH CAUSE OF ACTION**

**Violation of the California Shared Appreciation Loan Statutes (Pleaded in the Alternative)**

**Cal. Civ. Code § 1917 et seq.**

**(Against All Defendants, on Behalf of All Plaintiffs and the California Class)**

117. Plaintiffs reallege and incorporate by reference every allegation above.

118. California authorizes shared appreciation lending only within defined statutory channels. Where the Legislature has permitted a lender to take contingent deferred interest, it has defined that interest as "a share of (1) the appreciation in the value of the security property (2) rents and profits attributable to the subject property, or (3) both," Cal. Civ. Code § 1917(a), and the statutory programs authorizing shared appreciation instruments for owner-occupied homes measure the lender's contingent share against net appreciated value, with mandatory plain language disclosures of how the contingent interest is calculated.

119. The Splitero product takes the form of a shared appreciation instrument, a deferred, value-contingent charge layered on a secured advance, but honors none of the statutory limits: the Split Percentage is taken from gross value, not from appreciation and not from net appreciated value; no shared appreciation disclosures are given; and the deed of trust does not identify the obligation as a shared appreciation loan. A charge that is guaranteed without regard to whether the property appreciates is not "contingent deferred interest" within the meaning of these statutes at all. *WRI Opportunity Loans II, LLC v. Cooper*, 154 Cal. App. 4th 525, 539 to 540 (2007).

120. Plaintiffs and the California Class are entitled to a declaration that the Option Documents are disguised shared appreciation loans that conform to no California statutory authorization, and that their value-contingent charges are interest; to an injunction against origination and enforcement of nonconforming instruments; and to all further relief available by statute and in equity. These violations are also pleaded as unlawful acts under the Unfair Competition Law below.

**X.**

**TENTH CAUSE OF ACTION**

**Violation of the California Financing Law (Pleaded in the Alternative)**

**Cal. Fin. Code §§ 22100, 22302, 22750**

**(Against Splitero Funding, Inc., Splitero, Inc., and DOES 1 through 10, on Behalf of All Plaintiffs and the California Class)**

121. Plaintiffs reallege and incorporate by reference every allegation above. This claim is pleaded in the alternative to the extent Defendants' claimed real estate broker status fails.

122. The transactions are consumer loans. On information and belief, no Defendant held a California Financing Law license under Cal. Fin. Code § 22100 in connection with the Class transactions, and, if the loans were not made or

arranged by a licensed real estate broker so as to fall within Cal. Fin. Code § 22057, Defendants engaged in the business of a finance lender without a license.

123. Independently, Cal. Fin. Code § 22302 applies Civil Code § 1670.5 to loan contracts subject to the Financing Law and provides that an unconscionable loan is a violation of the Financing Law subject to its remedies. The Option Documents are unconscionable for the reasons alleged in the Eleventh Cause of Action below. Under Cal. Fin. Code § 22750, willful charging of amounts in excess of those permitted, and willful violations in the making or collection of a loan, whether by a licensee or by an unlicensed person subject to the division, render the loan contract void, and no person has any right to collect or receive any principal, charges, or recompense.

124. To the extent the Financing Law affords no direct private right of action for any particular violation, Plaintiffs plead those violations as unlawful acts under the Unfair Competition Law below and seek declaratory relief concerning voidness under § 22750, restitution, and injunctive relief.

## XI.

## ELEVENTH CAUSE OF ACTION

### Unconscionability

### Cal. Civ. Code § 1670.5; Cal. Fin. Code § 22302

### (Against All Defendants, on Behalf of All Plaintiffs and the California Class)

125. Plaintiffs reallege and incorporate by reference every allegation above.

126. The Option Documents were unconscionable when made. Procedurally, they are contracts of adhesion drafted entirely by Splitero, presented on a take-it-or-leave-it basis in a standardized signing stack exceeding 60 pages, executed at a notary signing or, in the Turgman transaction, through a remote audio-video notarization, with no negotiation, no explanation, escrow instructions in the Fox transaction forbidding the homeowner to ask the settlement agent any

question about the documents, and marketing that misdescribed the fundamental nature of the product to unsophisticated, cash constrained homeowners recruited precisely because they could not qualify for conventional credit.

127. Substantively, the Option Documents are overly harsh and one-sided: a charge equal to twice the percentage of value advanced, effective on day one; a Safety Cap functioning as compound interest of approximately 19.6 to 21.9 percent per year; a 4.99 percent financed origination charge; a balloon obligation with a term of up to a quarter century; a power of sale over the homeowner's entire interest; default triggers keyed to the homeowner's performance of senior obligations owed to third parties; liquidated damages computed at the highest appraised value the property has ever had; appraisals at the homeowner's expense with Splitero empowered to set the value on noncooperation; a bar on junior financing without Splitero's written consent; indemnification of Splitero and recovery of the fees of its in-house counsel; a contractual claim to recoup any amount Splitero disgorges in a homeowner's bankruptcy; an arbitration clause with a carve out reserving the courts and nonjudicial foreclosure for Splitero alone; confidentiality; a loser-pays fee term; and jury, class, and private attorney general waivers that federal law prohibits outright.

128. Pursuant to Cal. Civ. Code § 1670.5, the Court may refuse to enforce the Option Documents in their entirety, may sever the unconscionable provisions, or may limit their application to avoid any unconscionable result. Pursuant to Cal. Fin. Code § 22302, a loan found unconscionable is a violation of the Financing Law subject to its remedies. Plaintiffs and the California Class seek a declaration of unconscionability, refusal of enforcement or severance, restitution of unconscionable charges, and injunctive relief.

## XII.

## TWELFTH CAUSE OF ACTION

## Intentional Misrepresentation

## (Against All Defendants, on Behalf of All Plaintiffs and the California Class)

129. Plaintiffs reallege and incorporate by reference every allegation above.

130. Defendants represented to Plaintiffs and to each Class member, uniformly, in marketing materials, on their website, in originator communications, and in the Option Documents themselves, that the HEI is not a loan, that no interest accrues, that there are no monthly payments and no new debt, and that Splitero acquires no immediate interest in the home.

131. Those representations were false when made. The transaction is a loan; a compound charge for the use of money accrues under the Safety Cap and is taken through the Split Percentage; the homeowner incurs a secured debt with a balloon maturity; and Splitero records an immediate lien against the homeowner's entire interest, with a power of sale.

132. Defendants knew the representations were false. Splitero computes an Equivalent Annual Percentage Rate for each transaction; instructs escrow to close the transaction as a loan; obtains lender's title insurance; uses federal rescission language and definitions in its own forms; holds lending-related licenses; and securitizes the receivables as mortgage assets. Defendants intended that homeowners rely on the representations, and Plaintiffs and the Class members reasonably relied, as Splitero's forms required them to acknowledge the very representations at issue.

133. As a direct and proximate result, Plaintiffs and the Class suffered damages, including the financed origination and closing charges, the encumbrance of their homes by liens securing unlawful charges, the accrual of unlawful compound charges against their equity, and the impairment of refinancing.

Defendants acted with malice, oppression, and fraud within the meaning of Cal. Civ. Code § 3294, entitling Plaintiffs and the Class to punitive damages.

## XIII.

## THIRTEENTH CAUSE OF ACTION

### Fraudulent Concealment

### (Against All Defendants, on Behalf of All Plaintiffs and the California Class)

134. Plaintiffs reallege and incorporate by reference every allegation above.

135. Defendants concealed and suppressed material facts they were bound to disclose, both because the disclosure statutes pleaded above imposed affirmative duties and because Defendants' partial representations about the nature and cost of the product made full disclosure necessary to prevent the representations from being misleading. The concealed facts include: the annual percentage rate and finance charge of the transaction, which Splitero computed internally and withheld; that the Safety Cap is compound interest; that the Split Percentage is taken from gross value rather than appreciation, so that the homeowner owes approximately twice the percentage advanced even if the home never appreciates; that the obligation balloons at a fixed maturity date; that default on senior obligations, taxes, insurance, or maintenance exposes the home to acceleration and nonjudicial foreclosure; that the recorded instruments encumber the homeowner's entire interest; and that federal law prohibits the arbitration and waiver terms Splitero inserted.

136. Plaintiffs and the Class members did not know the concealed facts, would not have entered into the transactions had the facts been disclosed, and were damaged as alleged above. Defendants' concealment was intentional and undertaken to induce the transactions. Plaintiffs and the Class are entitled to compensatory and punitive damages.

## XIV.

## FOURTEENTH CAUSE OF ACTION

## Negligent Misrepresentation

**(Against All Defendants, on Behalf of All Plaintiffs and the California Class)**

137. Plaintiffs reallege and incorporate by reference every allegation above.

138. In the alternative to the Twelfth Cause of Action, Defendants made the representations alleged above without reasonable grounds for believing them to be true, in the course of their business and in transactions in which they had a pecuniary interest, intending that Plaintiffs and the Class rely. Plaintiffs and the Class justifiably relied and were damaged as alleged above.

## XV.

## FIFTEENTH CAUSE OF ACTION

## Violations of the Unfair Competition Law

## Cal. Bus. & Prof. Code § 17200 et seq.

**(Against All Defendants, on Behalf of All Plaintiffs and the California Class)**

139. Plaintiffs reallege and incorporate by reference every allegation above.

140. Defendants' conduct constitutes unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200.

141. Unlawful. Defendants' practices violate, among other laws: TILA, 15 U.S.C. §§ 1635, 1638, 1639, 1639c, and 1641, and Regulation Z, 12 C.F.R. §§ 1026.17 through 1026.19, 1026.23, 1026.32, 1026.34, 1026.36(h), 1026.37, 1026.38, and 1026.43, as alleged above, including the integrated disclosure requirements of 12 C.F.R. §§ 1026.19(e) and (f); RESPA, 12 U.S.C. § 2607, as alleged above; the California Reverse Mortgage Law, Cal. Civ. Code §§ 1923 through 1923.10; the shared appreciation loan statutes, Cal. Civ. Code § 1917 et seq.; the California Financing Law, Cal. Fin. Code §§ 22100, 22302, and 22750; the Real Estate Law, Cal. Bus. & Prof. Code §§ 10240, 10241, and

10241.3; and Cal. Civ. Code § 3513, by exacting waivers of laws established for public reasons.

142. Unfair. Defendants' practices offend the legislative policies embodied in the statutes just described; the harm to consumers, the undisclosed cost of credit, the loss of statutory protections, the risk of foreclosure, and the impairment of refinancing substantially outweighs any countervailing benefit; and the injury is one consumers could not reasonably have avoided, given Defendants' uniform misdescription of the product and their instruction that consumers not seek explanations from the settlement agent.

143. Fraudulent. Defendants' representations that the HEI is not a loan, involves no interest, no monthly payments, and no new debt, and that Splitero acquires no immediate interest in the home, are likely to deceive a reasonable consumer.

144. Plaintiffs have suffered injury in fact and lost money or property as a result of Defendants' unfair competition, including the origination charges and closing costs deducted from their advances, the encumbrance of their homes, and the diminution of their equity by accruing unlawful charges.

145. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the California Class are entitled to restitution of all amounts Defendants obtained by means of the practices alleged, and to injunctive relief, including orders directing reconveyance and cancellation of the recorded instruments upon rescission or voidness.

146. Plaintiffs further seek, on their own behalf, public injunctive relief under § 17203 prohibiting Defendants from advertising, marketing, or documenting home equity investment agreements secured by California residences as "not a loan," involving "no interest" or no new debt, or by any equivalent representation, and from originating such agreements in California without complying with the disclosure, counseling, ability-to-repay, licensing, and arbitration prohibitions of federal and California law. That relief has as its

primary purpose and effect the prohibition of unlawful acts that threaten future injury to the general public, and the right to seek it cannot be waived by any provision of the Option Documents. *McGill v. Citibank*, N.A., 2 Cal. 5th 945, 951 to 952 (2017).

**XVI.**

**SIXTEENTH CAUSE OF ACTION**

**Violations of the False Advertising Law**

**Cal. Bus. & Prof. Code § 17500 et seq.**

**(Against All Defendants, on Behalf of All Plaintiffs and the California Class)**

147. Plaintiffs reallege and incorporate by reference every allegation above.

148. Defendants, with the intent to induce members of the public to enter into HEI agreements, disseminated and caused to be disseminated before the public in California, through their website, advertising, originators, and standardized documents, statements concerning the HEI that were untrue or misleading and that Defendants knew, or in the exercise of reasonable care should have known, were untrue or misleading, including that the HEI is not a loan, involves no interest, and creates no new debt.

149. Plaintiffs relied on those statements and lost money or property as a result. Plaintiffs and the California Class are entitled to restitution and injunctive relief, including the public injunctive relief described above, pursuant to Cal. Bus. & Prof. Code § 17535.

**XVII.**

**SEVENTEENTH CAUSE OF ACTION**

**Unjust Enrichment; Money Had and Received**

**(Against All Defendants, on Behalf of All Plaintiffs and the Class)**

150. Plaintiffs reallege and incorporate by reference every allegation above.

151. By deducting origination charges and closing costs from the advances, by collecting administrative and third-party fees, and by collecting Total

Repurchase Amounts, Safety Cap charges, and Protective Advance interest from Class members who have concluded their transactions, Defendants received money that in equity and good conscience belongs to Plaintiffs and the Class, obtained through transactions that are unlawful, rescinded, void, or unconscionable as alleged above.

152. Defendants hold that money, including the $5,988.00 and $7,592.98 origination charges, as involuntary trustees for Plaintiffs and the Class, and Plaintiffs and the Class are entitled to restitution of all such sums with interest, to the extent not duplicative of other recovery. This claim is pleaded in the alternative to the extent an adequate remedy at law exists.

## XVIII.

## EIGHTEENTH CAUSE OF ACTION

### Cancellation of Instruments

### Cal. Civ. Code §§ 3412 and 3413

### (Against All Defendants, on Behalf of All Plaintiffs and the Rescission Subclass and California Class)

153. Plaintiffs reallege and incorporate by reference every allegation above.

154. The recorded Deeds of Trust and Notices of Option Purchase Agreement are void or voidable as to Plaintiffs and Class members because the security interests are void upon rescission under 15 U.S.C. § 1635(b) and 12 C.F.R. § 1026.23(d)(1); because the underlying contracts are void or unenforceable under Cal. Fin. Code § 22750 and Cal. Civ. Code § 1670.5, as alleged above; and because the instruments secure charges that the law forbids.

155. There is a reasonable apprehension that, if left outstanding, these recorded instruments may cause serious injury to Plaintiffs and Class members: they cloud title, impair refinancing and sale, secure accruing unlawful charges, and expose the homes to acceleration and nonjudicial foreclosure. The invalidity of

the instruments is not apparent on their face and requires proof of the facts alleged in this Complaint, so cancellation is the appropriate remedy.

156. Plaintiffs and the Class are entitled to a judgment adjudging the Deeds of Trust and Notices of Option Purchase Agreement void, ordering them delivered up and canceled, and directing Defendants to execute and record full reconveyances and releases. Cal. Civ. Code § 3412.

## XIX.

## NINETEENTH CAUSE OF ACTION

## Declaratory Relief Under California Law: The Contracts Are Illegal and Void as Against Public Policy

**(Against All Defendants, on Behalf of All Plaintiffs and the California Class)**

157. Plaintiffs reallege and incorporate by reference every allegation above.

158. An actual controversy exists concerning whether the Option Documents are illegal and void or voidable under California law. Plaintiffs contend, and Defendants dispute, that the Option Documents: are loans and reverse mortgages originated in knowing violation of the counseling, waiting period, and disclosure requirements of the Reverse Mortgage Law; take contingent charges that only the shared appreciation statutes could authorize, on terms those statutes forbid; are void under Cal. Fin. Code § 22750 if willfully made or collected in violation of the Financing Law; are unconscionable; and exact waivers of laws established for public reasons, which Cal. Civ. Code § 3513 forbids private agreements to contravene.

159. Plaintiffs and the California Class are entitled to a judicial declaration of the parties' rights and duties, including a declaration that the Option Documents, or the offending provisions of them, are illegal and unenforceable; that no interest, fees, or charges may be collected; and that Defendants must reconvey and release the recorded instruments on such conditions as the Court finds equitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment against Defendants, and each of them, as follows:

a. An order certifying the Nationwide TILA Class, the Rescission Subclass, the High-Cost Mortgage Subclass, the Arbitration Clause Class, and the California Class, under Rule 23(a), (b)(2), (b)(3), and (c)(4); appointing Nathanial Fox and Osama Turgman as Class Representatives; and appointing BLC Law Center, APC and Kazerouni Law Group, APC as Class Counsel;

b. A declaration that the Option Documents constitute consumer credit transactions, residential mortgage loans, and high-cost mortgages under TILA, HOEPA, and Regulation Z, and loans, reverse mortgages, and unauthorized shared appreciation obligations under California law;

c. A declaration that Sections 11.21 and 11.22 of the Option Purchase Agreement and all similar arbitration, jury waiver, class waiver, and private attorney general waiver provisions are void and unenforceable under 15 U.S.C. § 1639c(e), 12 C.F.R. § 1026.36(h), and California law, and an injunction prohibiting Defendants from invoking them against any Class member;

d. A declaration that Plaintiffs have validly rescinded their transactions under 15 U.S.C. § 1635; an order declaring the Deeds of Trust and Notices of Option Purchase Agreement void, canceling them under Cal. Civ. Code § 3412, and directing Defendants to reconvey and record releases; an order directing return of all money paid, including all origination and closing charges; and an order establishing the terms and procedure for tender;

e. A declaration that each member of the Rescission Subclass holds an unexpired right of rescission under 15 U.S.C. § 1635(f), and an order

establishing a classwide procedure for its exercise, binding on all Defendants and all assignees under 15 U.S.C. § 1641(c);

f. Actual damages under 15 U.S.C. § 1640(a)(1) on the First through Fifth Causes of Action, according to proof;

g. Statutory damages under 15 U.S.C. § 1640(a)(2)(B) in the maximum amount permitted;

h. Enhanced damages under 15 U.S.C. § 1640(a)(4) equal to the sum of all finance charges and fees paid by each affected Class member;

i. Treble damages, jointly and severally, under 12 U.S.C. § 2607(d)(2) for each settlement service charge paid in violation of RESPA;

j. A declaration of voidness and disgorgement of all principal, charges, and recompense collected on loans within Cal. Fin. Code § 22750, and all further remedies available under the California Financing Law, including for unconscionable loans under Cal. Fin. Code § 22302;

k. Restitution under Cal. Bus. & Prof. Code §§ 17203 and 17535, and restitution and disgorgement on the common counts;

l. Public injunctive relief under Cal. Bus. & Prof. Code §§ 17203 and 17535 prohibiting Defendants from marketing home equity investment agreements secured by California residences as not a loan, without interest, or without debt, and from originating or enforcing such agreements without complying with federal and California credit law;

m. Compensatory and punitive damages on the fraud causes of action;

n. Prejudgment and postjudgment interest as permitted by law;

o. Reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1640(a)(3), 12 U.S.C. § 2607(d)(5), Cal. Code Civ. Proc. § 1021.5, and every other applicable provision; and

p. Such other and further relief as the Court deems just and proper.

Dated: November 13, 2026, By: **BLC LAW CENTER, APC**

*s/ Ahren A. Tiller*
Email: ahren.tiller@blc-sd.com

Ahren A. Tiller, Esq.
Attorneys for Plaintiffs, and
All Those Similarly Situated

**Additional Counsel Listed Below:**

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N. Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**BLC LAW CENTER, APC**
Brett F. Bodie Esq. [SBN: 264452]
Email: brett.bodie@blc-sd.com
1230 Columbia St., Ste 1100
San Diego, CA 92101
Phone: (619) 894-8831
Facsimile: (866) 444-7026

Attorneys for Plaintiffs & the Proposed Class

## DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment to the Constitution of the United States of America and Federal Rule of Civil Procedure 38(b), Plaintiffs are entitled to, and demand, a trial by jury on all issues so triable. The purported waiver of jury trial in Section 11.21 of the Option Purchase Agreement is void under 15 U.S.C. § 1639c(e).

Dated: November 13, 2026, By: BLC Law Center, APC

*s/ Ahren A. Tiller*
Email: ahren.tiller@blc-sd.com
Ahren A. Tiller, Esq.
Attorneys for Plaintiffs